NATALIE, Administrator, Respondent, vs. CHICAGO & MIL-
WAUKEE ELECTRIC RAILROAD COMPANY and others, Ap-
pellants.

*November 17, 1914—May 4, 1915.*

*Interurban railways: Killing of child on track: Negligence of motor-
man: Evidence: Unsupported verdict: Gross negligence: Proxi-
mate cause: Violation of safety statute.*

1. In an action to recover for death of a boy about four years old
   who started suddenly to run diagonally across a street and was
   struck and killed by defendants' interurban electric car, which,
   as the jury found, was not running at an excessive rate of speed,
   a finding by the jury that the motorman was negligent in not
   stopping the car in time to avoid the accident is *held* not to be
   supported by any credible evidence, it appearing clearly from
   his uncontradicted testimony, corroborated by a number of in-
   dependent facts and circumstances, that as soon as he saw the
   boy leave the sidewalk he applied the brake and did everything
   in his power to stop the car.
2. The contradictory impressions or estimates of several witnesses
   as to the speed of the car, which they observed only momentarily
   at a time when they were laboring under excitement, are *held*
   in this case to be too vague, uncertain, and unsatisfactory to put
   in issue the large volume of evidence to the contrary.
3. Gross negligence of the defendant is not a sufficient basis for a
   recovery for a personal injury unless such negligence was the
   proximate cause of the injury.
[4. Whether the failure of a company operating an interurban rail-
   way to provide a car with a suitable fender or pilot as required
   by sec. 1636—58, Stats., which makes such failure punishable
   by fine only, should, under the decision in *Pinoza v. Northern C.
   Co.* 152 Wis. 473, be classed with gross negligence, so that a per-
   son injured by reason of such failure could recover even if he
   was guilty of contributory negligence, is not decided.]

APPEAL from a judgment of the circuit court for Milwau-
kee county: OSCAR M. FRITZ, Circuit Judge.   *Reversed.*

Joseph Natalie, an infant four and one-quarter years of
age, was killed by one of the defendants' interurban cars near
the intersection of First avenue and Park street in the city of
Milwaukee, and his father as administrator brings this action

to recover damages for his death. The boy left home, and his father went out to look for him and found him on the east side of First avenue between fifty-five and sixty feet north of the Park street corner. The father called to the boy to go home, and he immediately started to run across the street diagonally in a southwesterly direction. A car proceeding south on the west track collided with the boy and killed him. The car was fifty-two feet in length and weighed about forty tons. The negligence claimed was (1) excessive speed, (2) failure to give proper signals, (3) failure to equip the car with a proper fender, (4) failure to stop the car in time to avoid the collision.

The jury found (1) that when the motorman applied the brakes the car was proceeding at a speed of fifteen miles per hour; (2) that this rate of speed was not excessive; (3) that the motorman did not negligently fail to sound the gong or whistle; (4) that in the exercise of ordinary care the motorman should have brought the car to a stop in time to avoid the accident; (5) that such failure was a proximate cause of the injury; (6) that Joseph Natalie was in front of the pilot at the time of the collision; (7) that the car was not provided with a suitable pilot; (8) that the failure to provide such a pilot was not a proximate cause of the injury; (9) that the parents of Joseph Natalie were not guilty of any want of ordinary care which proximately contributed to produce his injuries; and (10) that plaintiff sustained damages in the sum of $1,091. Judgment for plaintiff was entered on this verdict and defendants appeal.

For the appellants there were briefs by *Edgar L. Wood,* attorney, and *Bull & Johnson,* of counsel, and oral argument by *Mr. Wood.* They argued, among other things, that the defendants are not liable for the consequences of the sudden act of the child in running in front of the car, in the absence of evidence that the car could have been stopped in time to have avoided the collision. *Holdridge v. Mendenhall,* 108

Wis. 1, 83 N. W. 1109; *Glettler v. Sheboygan L., P. & R. Co.* 130 Wis. 137, 109 N. W. 973; *Monrean v. Eastern Wis. R. & L. Co.* 152 Wis. 618, 140 N. W. 309; *Jorgenson v. C. & N. W. R. Co.* 153 Wis. 108, 116, 140 N. W. 1088.

For the respondent there was a brief by *Glicksman, Gold & Corrigan,* and oral argument by *W. L. Gold.*

The following opinion was filed December 8, 1914:

BARNES, J.   The appellants contend that the finding that the motorman was negligent in failing to stop the car is not supported by any evidence and is contrary to the undisputed testimony in the case.   The respondent argues (1) that the finding has sufficient support in the evidence, and (2) that the failure to provide such a fender as the law requires was gross negligence for which there can be a recovery notwithstanding the finding of the jury that the failure to provide a proper fender was not a proximate cause of the boy's injury.

A third contention to the effect that the interurban car was a nuisance in the street is argued in the brief.   We understand that this claim has been abandoned.   It was based on a conceded error in printing the articles of incorporation of the defendant.

1.   The motorman testified that he observed the boy running just as he left the curb and that he fully appreciated the fact that there was likelihood of his being struck by the car, and that he immediately applied the emergency brake with full force, sounded the alarm whistle, struck the gong, and opened the sand box.   No witness testified to the contrary in reference to the brake being set.   The jury found that proper signals were given, but apparently disbelieved the evidence of the witness in reference to setting the brake.   The motorman testified that the speed of the car was only six or eight miles an hour.   The jury did not believe this evidence, and it must have found that the car was further away from the point of collision when the boy left the curb than the motorman claimed

it was. The respondent argues that the motorman's evidence was contradicted and found to be untrue in some important particulars and that the jury might disregard his statement in reference to applying the brake, and that there was evidence in the case from which it might properly be inferred that he did not exercise due care in attempting to stop the car.

Certain important facts are settled by the verdict of the jury and others equally important by the undisputed evidence. All the witnesses agree that the boy was running, and it appears without dispute that the distance from the curb to the place where he was struck was thirty-three feet. There is nothing whatever to indicate that he did not run in a substantially straight line. But one witness, Anton Gross, testified to the rate of speed at which the boy was running. He said: The boy "was going just as fast as kids can run. He can make three miles an hour all right, four if he runs a full hour."

"*Q.* If he ran a full hour he might; you think that was the rate the little fellow was running when you saw him? *A.* Yes, sir; whether he was going slower than that I didn't know, or whether he was going faster than that I cannot tell, on that. I can't tell how fast the little boy was going."

It is perhaps a matter of common knowledge that boys four and one-quarter years old can run as fast as what would be a fair walking gait for a man, which is about four miles an hour. On this basis the boy would run thirty-three feet in six seconds. If his rate of speed were only three miles an hour it would take him not to exceed eight seconds. So it is apparent that the accident happened quickly after the boy left the sidewalk and that the motorman did not have much time to stop the car. The boy's father was as close to the point of collision as the boy was when he started to run, but made no attempt to catch him because he said it would do no good and both of them would get hurt. He did not even call to the boy to stop, but stepped into the street and waved his hands at the

motorman and shouted to him to stop.    As the boy was run-
ning across the street he passed within twenty or twenty-five
feet of the father.    Those of the witnesses in the car who
testified on the point said that the accident happened very
quickly.    Plaintiff's witnesses did likewise in effect, most of
them estimating the speed of the car at from twenty-five to
thirty-five miles an hour.    Now it is in evidence and is ap-
parent that it takes a little time to shut off the power and ap-
ply the brake.    It is also in evidence that it takes a little time
for the brake to take hold after the air is applied.    Two wit-
nesses testified on this point, an expert called by plaintiff, and
the motorman.    They disagree as to the length of time, plaint-
iff's witness putting it at five seconds and the motorman at one
second.    We must of course accept the testimony most favor-
able to the plaintiff.    The car did not run to exceed sixty-five
or seventy feet after the boy was struck.    The motorman tes-
tified that if the car was going eight miles an hour it could be
stopped in a distance of eighty or ninety feet.    He did not
testify to any other rate of speed.    Plaintiff's expert testified
that if the car was going eight miles an hour it could be
stopped in fifteen or twenty feet; nine miles an hour, twenty-
five feet; at ten miles an hour, thirty-three feet; at eleven
miles an hour, fifty-five feet; at twelve miles, ninety feet; at
thirteen miles, same; at fourteen miles, same; at fifteen miles,
two hundred feet.    Counsel evidently thought he testified in-
advertently in giving the latter distance, and repeated his
question and received the same answer a second time.    If the
evidence as to the fifteen-mile rate of speed is correct, then
the brake must have been applied 130 feet from where the
boy was struck.    Considering the relative speeds at which
they were probably traveling and the decreasing speed of the
car due to the operation of the brake, they would reach the
point of collision about the same time.    The distance required
to make the stop as testified to by the expert is further cor-
roborated by a number of witnesses who were riding in the

car at the time of the accident.    Three of them testified that
the whistle was blown and the brakes applied when the car
was about the center of the block.    This evidence is not dis-
puted in reference to the setting of the brake.    There was
some evidence tending to show that the whistle was not blown,
but the jury found otherwise.    The center of the block is sub-
stantially 120 feet north of the point of collision, and if the
brake was applied at or near that point it must have been set
about as soon as it could be after the boy left the sidewalk.
There is another important circumstance that corroborates the
evidence of the motorman in regard to the application of the
brake.    The jury has found that the motorman sounded the
whistle or gong so as to give timely warning of the approach
of the car.    This finding is supported by the clear preponder-
ance of the testimony.    The witnesses who testify on the sub-
ject, and there are a number of them, agree that the sounding
of the whistle and the application of the brakes occurred al-
most simultaneously.    Some of them thought the brakes were
first applied, but most of them believed they heard the whistle
first.    This would be the result if the whistle was blown and
the air applied at the same instant, because on the undisputed
evidence it would take at least a second before the brakes
would take hold, during which time the car would travel
twenty-two feet.    Two of the witnesses said that the setting
of the brakes caused them to be thrown forward.    The testi-
mony to the effect that the brakes were set and the whistle
blown at about the same instant is wholly uncontradicted.    If
the motorman exercised due care in blowing the whistle and
he was not running his car at an excessive rate of speed, we
are at a loss to see how it can be said that he was negligent in
not bringing the car to a standstill in time to avoid the injury.
It seems pretty clear that he did everything in his power to
stop the car as soon as he saw the child leave the sidewalk.

It will be seen that there are a number of independent facts
and circumstances which strongly corroborate the statement of

the motorman to the effect that the brake was applied as soon as the boy left the sidewalk. We have been unable to find any testimony which tends to contradict his evidence in regard to the application of the brake. Respondent's counsel make a rather ingenious argument in support of the finding. It is assumed without a syllable of proof to support the assumption that the child crossed the street in a semicircular direction and traveled fifty feet after leaving the curb. It is next assumed, without any proof and contrary to the evidence, that he traveled three feet a second or about two miles an hour. It is said that it would take him seventeen seconds on this basis to reach the point of collision and that during this time the car going at a speed of fifteen miles an hour would travel 376 feet. The obvious trouble with this calculation is that the facts on which it is based are nonexistent. Another claim made by the respondent is that the evidence of its expert that a car going at a rate of twelve, thirteen, or fourteen miles an hour could be stopped in a distance of ninety feet should also apply to a car going fifteen miles an hour, although the same witness twice testified that it could not be brought to a stop inside of 200 feet. It would appear to the nonexpert that this witness was mistaken in some of his figures. It does not seem probable that a car going at a rate of fourteen miles an hour can be stopped as quickly as one going twelve miles, and the jump from ninety feet at twelve, thirteen, and fourteen miles to 200 feet at fifteen miles would seem to be an athletic one, particularly where the witness testified that at a speed of twenty-five miles an hour the car could be stopped in a distance of from 300 to 325 feet. There may be and probably is a discrepancy in this evidence, but the expert was plaintiff's witness and gave the only evidence pertaining to a fifteen-mile speed, was asked for no explanation of the apparent incongruity in his figures, and those given for a speed of fifteen miles an hour are corroborated by other undisputed testimony. Even if it were true that a car going twelve, thirteen,

or fourteen miles an hour could be brought to a standstill in ninety feet, we do not see how the motorman could be held negligent. Considering the location of the car when the boy left the curb, the fact that it took some time to shut off the power and apply the brake and some time for the brakes to take hold, we do not see how it was possible for the motorman, under the evidence, to stop the car in time to avoid the collision.

Some wild guesses or estimates were made by some witnesses as to the speed of the car. They placed it at from twenty-five to thirty-five miles an hour. Anton Gross thought the speed was twenty-five miles an hour. He said that when the boy was on the east rail of the south-bound track the car was 100 feet away. No one claims that the boy stopped or hesitated in his journey until he was struck. If the speed of the car was not slackened it would consume four and one-half seconds in reaching the point of collision. On any calculation it would not take the boy more than a second or two to get out of the zone of danger after he reached the east rail of the track. If that was the situation, the motorman might well assume that the boy had ample time to cross the track if he was running. If he was standing, his father had plenty of time to reach him. As a matter of fact the boy was found directly in front of the foremost wheel of the rear truck and on the east rail of the track. The body was not mangled and there was no evidence to show that it had been dragged.

Another witness, Stavaboulas, testified through an interpreter. It is extremely difficult to get anything out of his testimony. Occasionally he made a responsive and coherent answer to the question asked him. He said he saw a man evidently the plaintiff and the car about the same time and that the car was about 140 feet away. He then made a mark on a plat shown him to indicate where the man was. This point was about eighty feet south of where the boy was struck, which would locate the car about sixty feet north of the point

of collision.   He said that when he first saw the boy he was on the east rail of the south-bound track and located him about twenty-five feet south of the place where he was struck.   It is practically conceded that the boy was running in a south-westerly direction, and no other witness makes any claim that the boy at any time proceeded in a northwesterly direction. Witness then made a mark to indicate where he thought the car was when he first saw the boy, and he made a mark on the plat about 175 feet north of the point of collision.   This evidence would indicate that when the boy reached the east-bound track he was 200 feet south of the car and a few steps from his father, and he would have to exceed nine seconds to cross the west-bound track and his father would have an equal length of time to reach him.   At the outside he was not to exceed thirty-five or forty feet from where the boy was hit, and he could have reached him before the car did if he even walked four miles an hour.   The record shows that he was unfamiliar with locating points on plats.   Admittedly he saw the father and the car before he did the boy, and still he states that the car was substantially 115 feet farther north when he saw the boy than it was when he saw the father.

. Anton Gross testified that the car had just left the Virginia street crossing when plaintiff waved his hands to the motor-man to stop the car.   This was about 250 feet from the place of the accident and it would take the car eleven seconds to make it without slacking its speed.   The plaintiff, who was not more than thirty-five feet from where his boy was struck, said that the car was so close and coming so fast that he would himself have been hit if he had attempted to run after the boy.   These mere estimates of the distance which the car was from a given point at a given time were apparently based on the exaggerated notions which the witnesses entertained as to the speed of the car.   If the evidence has any probative force, it proves too much when we take into account the established fact that the speed of the car was fifteen miles an hour.   It

shows that there was no earthly excuse for the father permitting his boy to be run down. It also shows that the motorman had little reason to apprehend that the boy would not cross the tracks in safety, until it was too late to bring the car to a standstill. Every witness who saw the boy, including his father, says he was running. This fact is as fully established as if the jury had so found. All the witnesses agree that he was running diagonally across the track, unless the mark made by Stavaboulas may be said to prove the contrary, and we do not think it does. The distance from where the boy left the walk to where he was struck is admitted. The contradictory impressions of these three witnesses, which were the result of a momentary observation of the car while they were laboring under excitement, are too vague, uncertain, and unsatisfactory to put in issue the large volume of evidence to the contrary found in the record. *Riger v. C. & N. W. R. Co.* 156 Wis. 86, 144 N. W. 204. It is true, one witness testified that the car did not slacken speed until after it struck the boy. But this forty-ton car stopped in sixty or seventy feet at the outside thereafter, and, according to the evidence of those who knew, it could not possibly be stopped in any such distance if it was going fifteen miles an hour when the boy was struck.

2. Sec. 1636—58, Stats., provides:

"Every person, firm or corporation operating any street or interurban railway or other railway operating cars similar to those used by street or interurban railways shall provide all cars operated singly, and the front car in all trains, with suitable fenders or pilots so arranged and constructed as to protect the lives, limbs and bodies of all persons that may be upon the street or highway, against injury by striking or running over them."

Respondent's counsel argue that the jury found that this statute had not been complied with and that the defendants were guilty of gross negligence on account of the violation of

the statute, under the decision in *Pinoza v. Northern C. Co.* 152 Wis. 473, 140 N. W. 84. It is there held that where the violation of a safety statute is made a criminal offense such violation should be classed with gross negligence, and that a person injured because of the failure to comply with the statute could recover notwithstanding the fact that he was guilty of contributory negligence. The material difference between the two statutes, if there is any, arises out of the fact that sec. 1728a, under which the *Pinoza Case* was decided, provides a punishment by fine or imprisonment, while sec. 1636—58 provides for a fine only. Whether this distinction be important or not it is unnecessary to decide, because the *Pinoza Case* does not reach the question here involved. In that case the jury found that the failure to comply with the statute was the proximate cause of the injury. Here the jury found that the failure to furnish a suitable pilot or fender was not a proximate cause of the injury. The element of proximate causation must exist in the case of gross negligence as well as in ordinary negligence in order to make a case for recovery.

On the issues found by the jury against the plaintiff the verdict is supported by the clear preponderance of the evidence, if not by the overwhelming preponderance. The finding that the motorman was negligent in not stopping the car in time to avoid the accident is not supported by any credible evidence.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.

The respondent moved for a rehearing.

In support of the motion there was a brief by *Glicksman, Gold & Corrigan,* attorneys, and *Joseph E. Tierney,* of counsel; and in opposition thereto a brief by *Edgar L. Wood,* appellants' attorney, and *Bull & Johnson,* of counsel.

The motion was denied, with $25 costs, on May 4, 1915.